16 MAG 8150

Approved: _____
Edward B. Diskant/Daniel M. Tracer/Jennifer L. Gachiri
Assistant United States Attorneys

Before:  HONORABLE RONALD L. ELLIS
         United States Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :   **SEALED COMPLAINT**

         - v. -                    :   Violations of
                                       18 U.S.C. §§ 371, 1956,
LUIS DIAZ, JR., and                :   1960 and 2
LUIS JAVIER DIAZ,
                                   :   COUNTY OF OFFENSE:
                   Defendants.         NEW YORK

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       MATTHEW DE LA ROSA, being duly sworn, deposes and says that he is a Lieutenant with the Englewood, New Jersey Police Department and a Task Force Officer with the Department of Homeland Security, Homeland Security Investigations ("HSI") and the Drug Enforcement Agency ("DEA"), and charges as follows:

COUNT ONE
(Conspiracy to Operate an Unlicensed
Money Transmitting Business)

       1.  From at least in or about 2010 up to and including at least in or about 2016, in the Southern District of New York and elsewhere, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, and others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

       2.  It was a part and object of the conspiracy that LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, and others known and unknown, did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money

transmitting business affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 1960.

## Overt Acts

3. In furtherance of the conspiracy, and to effect the illegal objects thereof, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, together with others known and unknown, committed the following overt acts, in the Southern District of New York and elsewhere:

a. On or about April 10, 2012, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, caused a Florida company they owned and controlled in Doral, Florida (the "Company") to send approximately $1,454,763.93 to a Spanish bank account belonging to Shell Company-1, a shell company in Portugal, through a correspondent account at Deutsche Bank Trust Company America ("DB") in New York, New York, at the request of a large Venezuelan consortium of construction companies (the "Venezuelan Company").

b. On or about April 11, 2012, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, caused the Company to send approximately $2,546,000 to a bank account at Bank of New York Mellon in New York, New York, belonging to Shell Company-2, a shell company based in the British Virgin Islands ("BVI"), at the request the Venezuelan Company.

c. On or about December 16, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ caused the Company to send approximately $15,000 to an employee of the Venezuelan Company, VC Employee-1, at his bank account at Citibank in New York, New York, at the request of the Venezuelan Company.

d. On or about December 18, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ LUIS DIAZ caused the Company to send approximately $300,000 to a Venezuelan government official, VG Official-1, at his Panamanian bank account through a correspondent account at JPMorgan Chase located in New York, New York, at the request of the Venezuelan Company.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Operation of an Unlicensed Money Transmitting Business)

4. From at least in or about 2010 up to and including at least in or about 2016, in the Southern District of New York and elsewhere, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, did knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit, LUIS DIAZ, JR., and LUIS JAVIER DIAZ used the Company to transmit money into and through the United States, including into and through bank accounts in New York, New York, without an appropriate state license, which conduct was punishable as a felony under Florida law, and without meeting the Federal registration requirements set forth for money transmitting businesses.

(Title 18, United States Code, Sections 1960 and 2.)

## COUNT THREE
### (Money Laundering Conspiracy)

5. From at least in or about 2010 up to and including at least in or about 2016, in the Southern District of New York and elsewhere, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956(a)(2)(A).

6. It was a part and an object of the conspiracy that LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, the operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

(Title 18, United States Code, Sections 1956(h).)

## COUNT FOUR
(International Money Laundering)

7. From at least in or about 2010 up to and including at least in or about 2016, in the Southern District of New York and elsewhere, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, the operation of an unlicensed money transmitting business, to wit, LUIS DIAZ, JR., and LUIS JAVIER DIAZ used the Company to transmit funds from individuals and entities outside the United States to bank accounts located within the United States, including in New York, New York, and to transfer funds from accounts in the United States to accounts outside of the United States in furtherance of the operation of their unlicensed money transmitting business.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8. I am a Lieutenant with the Englewood, New Jersey Police Department and a Task Force Officer with HSI and DEA, and have been in that position for approximately four years. I have also participated in numerous investigations with the Special Narcotics Prosecutor in New York. In these capacities, I have participated in numerous investigations into money laundering, wire fraud, customs fraud, and other complex financial offenses, including unlicensed money transmitting offenses, and have personally participated in the investigation of this matter along with representatives of the DEA, HSI, the Englewood, New Jersey Police Department and the United States Attorney's Office for the Southern District of New York.

### Background

9. At all times relevant to his Complaint, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, in conjunction with certain of their family members, owned and controlled the Company. The Company is based in Doral, Florida, and is in the business of selling and exporting heavy equipment and parts to

4

buyers in the construction industry located outside the United States. In addition, and as more fully described below, the Company is also engaged in the business of transmitting money from individuals and entities outside the United States, mostly from Venezuela, to bank accounts located in the United States and elsewhere that are owned by individuals and entities located both inside and outside the United States, in exchange for a fee. Since in or about 2010, the Company has transmitted at least approximately $100 million in this fashion.

Relevant Statutory Framework

10. Florida law requires anyone operating a money transmitting business to be licensed. In particular, Florida Statutes Annotated, section 560.204 provides, in part, that "[u]nless exempted, a person may not engage in . . . the activity of a money transmitter, for compensation, without first obtaining a license[.]" Florida Statutes Annotated, section 560.103, in turn, explains that a "'[m]oney transmitter' means a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country." Under Florida Statutes Annotated, section 560.125, engaging in money transmission without the required license is punishable as a felony.

11. Based on my review of records obtained from the State of Florida, I have learned that at no point have LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, or the Company been licensed to operate as a money transmitting business in Florida.

12. Under Federal law, money transmitting businesses must also be registered with the U.S. Department of Treasury. This requirement is set forth in a series of statutes and regulations more fully set forth below:

a. Title 31, United States Code, section 5330(a)(1) provides that "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury[.]" Section

5

5330(d)(1), in turn, explains, in part, that the "term 'money transmitting business' means . . . (A) any . . . person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; (B) is required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g))."

    b. Title 31, United States Code, Section 5313(a) provides that "[w]hen a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency . . . in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes." The term "financial institution" is defined in 31 U.S.C. § 5312(a)(2)(R) as "a licensed sender of money or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system."

    c. Under the statutory scheme described above, the Secretary of the Treasury is given the authority to establish which individuals and entities are subject to 31 U.S.C. 5330's registration requirement. 31 U.S.C. §§ 5313(a); 5330(a)(2) & (c)(1). These regulations are contained in the Code of Federal Regulations ("CFR"). In particular, 31 C.F.R. § 1022.380(a)(1) provides that "each money services business (whether or not licensed as a money services business by any State) must register with FinCEN [an agency within the U.S. Department of Treasury] . . . . as required by 31 U.S.C. 5330[.]" 31 C.F.R. § 1010.100(ff) includes a "money transmitter" as a "money services business." The term "money transmitter" is, in turn, defined by 31 C.F.R. § 1010.100(ff)(5) to include "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means. 'Any means' includes, but is not limited to . . . an informal value transfer system; or . . . [a]ny other person engaged in the

6

transfer of funds." Accordingly, the Treasury regulations establish that any person engaged in the transfer of funds is required to register with FinCEN.

13. Financial institutions are required to conduct various monitoring and reporting activities, including the filing of currency transaction reports ("CTRs") and Suspicious Activity Reports ("SARs"). For instance, the filing of CTRs is mandated by 31 C.F.R. § 1010.311, which provides that "[e]ach financial institution . . . shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000." This regulation applies to money services businesses as defined above. 31 C.F.R. § 1022.310. Likewise, "[e]very money services business . . . shall file with the Treasury Department, to the extent and in the manner required by this section, a report of any suspicious transaction relevant to a possible violation of law or regulation," also known as SARs. 31 C.F.R. § 1022.320(a)(1). By failing to register with FinCEN, a money transmitting business prevents the Treasury from ensuring that the business is properly filing CTRs and SARs. This has the effect of allowing an unregistered money transmitting business to operate as a shadow bank through which funds can pass without being subjected to the scrutiny that Congress has sought fit to impose upon the United States financial system.

14. Based on my review of records obtained from the United States Treasury, I have learned that at no point have LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, or the Company been registered with the Secretary of the Treasury or FinCEN as a money transmitting business as set forth in the statutes and regulations described above.

<u>The Use of Unlicensed Money Transmitters
to Move Funds Into and Through the United States</u>

15. Based on my training and experience, I have become familiar with some of the ways in which foreign-based individuals and entities seek to unlawfully and covertly move money into and through the United States. In one particularly common scheme, the individuals or entities based abroad will transfer funds to an individual or entity based in the United States who, in return for a percentage of the funds at issue, will then transfer those funds to other accounts in the United States or around the world.

16.     Oftentimes, participants engage in this scheme in order to avoid currency restrictions imposed by foreign countries that make it difficult for companies and individuals to hold or transact in U.S. dollars or to make payments abroad. This is accomplished by making it seem as if the funds are destined for a business purpose in the U.S. for which the foreign government might allow transactions in U.S. dollars, when in reality, the funds are destined for United States bank accounts owned by individuals and entities unrelated to the stated business purpose. Other times, participants engage in the scheme in order to convert less stable foreign currencies into U.S. dollars, which are perceived to be more stable based on economic and social conditions around the world. Still other times, participants engage in the scheme in order to move the proceeds of criminal activity without having to send the money directly to a licensed financial institution. By partaking in the scheme, participants take advantage of the fact that the individual or entity transmitting its money in the U.S. is not an appropriately licensed banking institution, and therefore the transmission will not be subjected to the oversight that the U.S. legal system imposes on financial institutions, including the filing of CTRs and SARs.

17.     For example, based on my training and experience, I am aware that the Venezuelan currency, the Bolivar Fuerte, is both highly unstable and extremely difficult to officially convert to U.S. Dollars due to economic conditions as well as Venezuelan governmental regulations. In particular, the Venezuelan government prohibits its citizen from owning or using United States dollars without government authorization. This creates an incentive for Venezuelan based individuals and entities to attempt to avoid the official conversion process that would have been required under Venezuelan law by engaging in transactions that are disguised as business payments to individuals and entities in the United States when, in reality, the money is intended for other beneficiaries in the United States or around the world.

18.     Based on my experience, including my participation in this investigation, I am aware that scheme participants will frequently create fake and false paperwork – such as invoices and purchase orders – purportedly documenting sales of goods and services to or by the U.S. entity that are intended to provide alternative explanations for the large transfers of funds. These arrangements have the effect of concealing the source and purpose of the money being transferred into the United States. As such, and in conjunction with the

use of unlicensed transmission businesses, the scheme provides an unregulated alternative to the financial system and poses a serious risk of enabling and facilitating money laundering.

### The Defendants Operated an Unlicensed Money Transmitting Business Through the Company

19. As detailed herein, and based on my review of records and interviews, there is probable cause to believe that between at least 2010 and 2016, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, have used the Company to effect the transmission of at least approximately a hundred million dollars from individuals and entities outside the United States, mostly located in Venezuela, to bank accounts in the United States and elsewhere, in exchange for a fee. During this time, the Company was not registered with the state of Florida or FinCEN as required by the regulations described above. Oftentimes, the defendants facilitated these transmissions by sending or receiving false and fraudulent invoices to make it appear that payments were for goods and services rendered when, in truth, the money was intended for a beneficiary with no business relationship to the Company. The invoices had the effect of further insulating the transmissions from scrutiny by providing a pretextual explanation for the payment if a third party, for example, the Company's bank, inquired as to the business purpose of these millions of dollars' worth of transmissions. Through this conduct, the defendants and the Company have functioned as an unregulated financial institution allowing foreign entities to move funds into and through the U.S. without any scrutiny, including being subject to the filing of SARs.

20. As part of my investigation, I have reviewed records related to the Company, mostly pertaining to the time period of approximately 2010 to 2016, including (a) bank records of accounts belonging to the Company and others; (b) export records from the U.S. Department of Customs and Border Patrol ("customs records") that contain filings and declarations that individuals and entities who export and import goods to and from the United States are required to file; (c) emails sent to and from LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, obtained pursuant to a judicially authorized search warrant[1]; and

---

[1] Substantially all of the Emails and attachments thereto are between people in Venezuela and the Company and are in Spanish. These documents have been translated, for the purposes of this

(d) files maintained by the Company that were seized during a search of the Company's premises pursuant to a judicially authorized search warrant in the Southern District of Florida. From my review of these records, I have learned that during the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, repeatedly engaged in a pattern of receiving funds in the United States from foreign-based individuals and entities and then transmitting those funds into other bank accounts held in the United States or abroad at the direction of these foreign individuals and entities, all for a fee. Transfers out from the Company were oftentimes preceded by emails providing LUIS DIAZ, JR., LUIS JAVIER DIAZ, and others who worked from them at the Company, with instructions about the transfers as well as invoices and purchase orders that purported to show that the beneficiary of the transfer had provided some bona fide service to the Company when, in truth and in fact, no services had been provided. Among others, the defendants engaged in this unlicensed transmission scheme for and on behalf of the following entities and individuals:

### Payments to Individuals and Entities on Behalf of the Venezuelan Company

21. During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, used the Company to transmit funds into and within the United States on behalf of the Venezuelan Company. Beginning at least as early as 2010, the Company made hundreds of these transmissions, which were funded by transfers from the Venezuelan Company to the Company of at least approximately $100 million during the relevant period. The Company then usually forwarded the proceeds of funds received from the Venezuelan Company in this manner to accounts in the United States and around the world that were held in the name of, or for the benefit of, employees and associates of the Venezuelan Company, and others to whom the Venezuelan Company wished to direct payments.

22. For example, on or about March 28 and March 30, 2012, an employee of the Venezuelan Company working in

---

Complaint, by a Spanish-speaking member of the Investigative Team. Notwithstanding the use of quotation marks – intended, in this context, to convey the fact that the e-mail itself is being quoted – these translations are preliminary, and are relied upon here principally to convey the sum and substance of the Spanish-language originals.

Venezuela, VC Employee-2, sent emails to LUIS DIAZ JAVIER, the defendant, cc'ing VC Executive-1, a senior executive at the Venezuelan Company, informing him that the Company would receive $4,360,912.50 from the Venezuelan Company and that the Company would be entitled to keep $87,218.26, or approximately two percent, as its fee. Of the remaining $4,273.694.24, the email instructed the defendants to pay (a) $1,454,763.93 to Shell Company-1, a shell company in Portugal controlled by a Venezuelan citizen with connections to Venezuelan government officials, and (b) $2,546,000.00 to Shell Company-2, a shell company based in the BVI owned by senior executives of the Venezuelan Company, including VC-Executive-1 and his relative, VC Executive-2.

23.  Attached to VC Employee-2's March 30 email were (a) an invoice purporting to be from Shell Company-1 to the Company in the amount of $1,454,763.93 for certain "partial payment of advice on procurement, testing, precommissioning and commissioning," and (b) an invoice purporting to be from Shell Company-2 to the Company in the amount of $2,546,000.00 for various services.

24.  Wire transfer records show that LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused the Company to make these payments to Shell Company-1 and Shell Company-2 on April 10 and 11, respectively. The payment to Shell Company-2 was directed to its bank account in New York, New York, and the payment to Shell Company-1 was directed to its bank account in Spain through a correspondent account at DB in New York, New York. The wire transfer records referenced the invoices that had been sent to the Company from the Venezuelan Company described above.

25.  Similarly, in emails dated May 17 and May 22, 2012, VC Employee-2 informed LUIS DIAZ JAVIER, the defendant, that the Company would be receiving $3,065,740.26 from the Venezuelan Company, and that the Company would keep $61,314.81, or approximately two percent, as its fee. Of the remaining $3,004,425.45, the email instructed that the Company pay, among others, (a) $1,012,500 to Shell Company-3, another BVI shell company owned by employees of the Venezuelan Company, (b) $1,012,500 to Shell Company-4, another BVI shell company owned by employees of the Venezuelan Company, and (c) $873,120 to Shell Company-1.

26.  Attached to VC-Employee-2's May 22 email, which cc'ed VC Executive-1, were invoices corresponding to each of

these requested payments. In particular, (a) an invoice of $873,120 purporting to be from Shell Company-1 for "partial payment of advice on procurement testing" to be paid to an account in Portugal; (b) an invoice of $1,012,500 purporting to be from Shell Company-4 for various activities to be paid to an account at HSBC in Miami; and (c) an invoice of $1,012,500 purporting to be from Shell Company-3 for various activities to be paid to an account at JPMorgan Chase in Miami. Wire records show that LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused the Company to make these four payments pursuant to these invoices within about two weeks of May 22, 2012.

27. During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused the Company to send numerous payments to Shell Company-2 at its New York, New York bank account on behalf of the Venezuelan Company, and in response to such false invoices provided by the Venezuelan Company, totaling at least approximately $37 million. Likewise, during the relevant period, the Company made numerous payments to Shell Company-1, Shell Company-3, and Shell Company-4, as recently as 2016, at the request of the Venezuelan Company, all in response to such false invoices provided by the Venezuelan Company totaling at least approximately $17 million, $2.4 million, and $2 million, respectively.

28. Based on my review of records obtained during the investigation, including the records seized from the Company during the judicially authorized search, there does not appear to be any evidence that the Company actually employed any consultants or other providers of the various services listed on the invoices provided by the Venezuelan Company during the relevant period, including Shell Company-1, Shell Company-2, Shell Company-3 or Shell Company-4.

29. Likewise, based on my review of customs records, I am aware that neither Shell Company-1, Shell Company-2, Shell Company-3 nor Shell Company-4, nor any of their Venezuelan Company owners, declared any imports or other shipments to the Company during the relevant time period that would justify the payments described above.

30. During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused the Company to pay funds to dozens of other executives and employees of the Venezuelan Company from funds that the Venezuelan Company transferred to the Company. In the course of these transfers, the Venezuelan Company often provided the Company with invoices

that purported to be invoices issued by the relevant Venezuelan Company employee to the Company in order to make it appear as if the employee had provided valuable goods or services to the Company in exchange for the payment.

31. For instance, on or about June 4, 2014, the Venezuelan Company sent $264,182.29 to the Company. The next day, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused $200,000 of that money to be transferred to an account at JP Morgan Bank held in the name of VC Executive-3, an executive at the Venezuelan Company.

32. Similarly, on or about March 2, 2015, the Venezuelan Company sent approximately $2,350,000 to the Company. During the next few weeks, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused a series of transfers to be made to other entities in that amount, including approximately $115,300 to a company registered in the state of Florida and owned by VC Executive-3, VC-3 Company, on March 25, 2015. Company records show that this payment to VC-3 Company was supposedly in satisfaction of an invoice issued from VC-3 Company to the Company dated March 23, 2105 in the amount of $115,300 for "professional services."

33. During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, used the Company to make numerous payments to VC Executive-3 and VC-3 Company in response to false invoices provided by the Venezuelan Company in this manner totaling at least approximately $2.7 million.

34. By way of further example, on or about December 11, 2014, VC Employee-2 sent an email to LUIS JAVIER DIAZ, the defendant. The email, including certain handwritten notations on it, contained instructions and a chart indicating the following transmissions to be made by the Company to Venezuelan Company employees: (A) $15,000 to be sent to VC Employee-1, (B) $868 to be sent to another employee of the Venezuelan Company, VC Employee-3, and (C) 2,453 to be sent to another employee of the Venezuelan Company, VC Employee-4. In the email, VC Employee-2 asked that LUIS JAVIER DIAZ send her the receipts of the transmissions so she could send them to the beneficiaries.

35. Attached to VC Employee-2's email was a set of three invoices purporting to be from VC Employee-1 to the Company in the amount of $5,000 each for "Professional Fees" to be paid to an account at Citibank in New York, New York. On or about December 16, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ,

13

the defendants, caused a transfer of approximately $15,000 to be made from the Company to VC Employee-1's New York, New York bank account, with the wire instructions referencing the invoices that had been provided to the Company from the Venezuelan Company.

36. Also attached to VC Employee-2's email was an invoice purporting to be from VC-Employee-3 to the Company in the amount of $868 each for "Professional Fee" to be paid to an account at Citibank in Florida. On or about December 15, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused a transfer of approximately $868 to be made from the Company to VC Employee-3's bank account, with the wire instructions referencing the invoice that had been provided to the Company from the Venezuelan Company.

37. Also attached to VC Employee-2's email was an invoice purporting to be from VC Employee-4 to the Company in the amount of $2,453 for "Professional Fee" to be paid to an account at Citibank in Florida. On or about December 15, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused a transfer of approximately $2,453 to be made from the Company to VC Employee-4's bank account, with the wire instructions referencing the invoice that had been provided to the Company from the Venezuelan Company.

38. Similarly, on or about December 17, 2014, VC Employee-2 sent an invoice purporting to be from VC Employee-5, another employee of the Venezuelan Company, to the Company in the amount of $15,000 for "Professional fee consulting offer" to be paid to an account at Citibank in New York, New York held in the name of VC Employee-5. On or about December 22, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused a transfer of approximately $15,000 to be made from the Company to VC Employee-5's Citibank account in New York. The wire instruction for this payment referenced the invoice that had been provided to the Company from the Venezuelan Company. Furthermore, on or July 29, 2015, LUIS DIAZ, JR., and LUIS JAVIER DIAZ caused an additional transfer of $10,000 to be made from the Company to VC Employee-5's Citibank account at the request of the Venezuelan Company.

39. According to the records seized from the Company during the judicially authorized search, there is no evidence that the Company employed VC Executive-3, VC-3 Company, VC Employee-1, VC Employee-3, VC Employee-4, VC Employee-5, and the dozens of other employees of the Venezuelan Company that were

sent money from the Company. Likewise, based on customs records, I have learned that VC Executive-3, VC-3 Company, VC Employee-1, VC Employee-3, VC Employee-4, and VC Employee-5, did not declare any imports to the Company that would justify the numerous payments made to such employees and entities.

40. At times, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, also used the Company to send numerous payments to other individuals and entities at the request of the Venezuelan Company for reasons wholly unrelated to the Company's business. For example, on or about December 15 and 16, 2012, VC Employee-2 sent a series of emails to LUIS JAVIER DIAZ, the defendant, instructing him to send money to a person, Beneficiary-1, out of the funds that the Company had received from the Venezuelan Company. Attached to one of these emails was an invoice purporting to be from Beneficiary-1 to the Company for a "professional fee" of $53,084 to be paid to an account at Bank of America in New Jersey.

41. On or about December 15 and 16, 2014 and March 12, 2015, respectively, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused transfers of $53,084; $53,084; and $86,975 to be transferred from the Company to the Bank of America account held in the name of Beneficiary-1. Some of the wire transfer records from the Company specifically referenced the invoice purportedly from Beneficiary-1.

42. According to an interview of Beneficiary-1's son with law enforcement agents on or about October 7, 2015, the series of payments from the Company represented payments for property in Venezuela sold to a principal of the Venezuelan Company. Beneficiary-1's son did not know why the payment had been sent through the Company, nor did he or his mother have any business relationship with Company.

43. Similarly, in or about June 2015, LUIS DIAZ, JR., and LUIS JAVIER DIAZ caused a transfer of approximately $2,000 to be made from the Company to an account held in the name of Beneficiary-2, a Venezuelan individual living in the United States.

44. According to an interview of Beneficiary-2's nephew with law enforcement agents, this transfer was made at the request of VC Executive-2, and was intended to pay for the nephew's surgery in the United States. According to the nephew, neither he nor Beneficiary-2 provided any goods or services to the Company.

Payments to Venezuelan Government Officials

45.     At times, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, used the Company to make transmissions to Venezuelan government officials, at the request of the Venezuelan Company. For instance, on or about December 17, 2014, VC Employee-2 sent an email to LUIS JAVIER DIAZ. The email, including certain handwritten notations on it, contained instructions and a chart indicating requests for the following transactions: (A) the Company would be receiving $1,100,000; (B) the Company would be entitled to a collection fee of $16,111.81; (C) $300,000 to be sent to VG Official-1; (d) $800,000 to be sent to VG-2 Company, a company owned by a former Venezuelan government official, VG Official-2; (e) $15,000 to be sent to VC Employee-5;[2] and (f) $16,000 to be paid to VG Official-3, another official in the Venezuelan government who, among other things, oversaw the award of certain contracts that the Venezuelan Company bid on. The email also indicated a "balance" of $107,246.93. Finally, the email instructed that it was important that the payment to VG Offical-1 be sent first.

46.     Attached to VC Employee-2's email was an invoice purporting to be from VG Offical-1 to the Company in the amount of $300,000 for "Consulting Professional" to be paid through an intermediary account at JPMorgan Chase in New York, New York. On or about December 18, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused a transfer of approximately $300,000 to be made from the Company to an account held in the name of VG Offical-1, with the wire instructions referencing the invoice that had been provided to the Company from the Venezuelan Company.

47.     Also attached to VC Employee-2's email was an invoice purporting to be from VG Official-3 to the Company in the amount of $16,000 for "Professional Service." On or about December 22, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused a transfer of approximately $16,000 to be made from the Company to an account held in the name of VG Official-3, with the wire instructions referencing the invoice that had been provided to the Company from the Venezuelan

---

[2] This payment, and an additional payment to VC Employee-5, were made as described in Paragraph 38 above.

Company.  Moreover, between approximately 2012 and 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ caused the Company to make a series of transfers totaling over $120,000 to VG Official-3's account.

48.  Also, on or about December 23, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused the Company to attempt to transfer $800,000 to VG-2 Company.  That wire was returned before being sent out again successfully by the Company on or about January 12, 2015.

49.  Similarly, on or about August 19, 2015, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused a transfer of approximately $294,897.50 to be made from the Company to an account held by a Texas based company that provides title insurance and other real estate services (the "Texas Company"), at the request of the Venezuelan Company.

50.  According to an interview with a representative of the Texas Company with law enforcement on or about May 26, 2016, this transfer was made to purchase a condo for VG Official-4, another Venezuelan government official.  According to this same representative, the Texas Company provided no goods or services to the Company.

51.  According to the records seized from the Company during the judicially authorized search, there is no evidence that the Company employed VG Offical-1, VG Official-3, VG-2 Company, and VG Official-4.  Likewise, based on my review of customs records, I am aware that VG Offical-1, VG Official-3, VG-2 Company, and VG Official-4 declared no imports to the Company during this time period that would justify the payments described above.

Payments on Behalf of Other Individuals and Entities

52.  During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, also used the Company to transmit payments into and within the United States on behalf of other foreign-based individuals and entities.  For instance, on or about July 6, 2012, Sending Company-1, another Venezuelan company, sent $364,680 to the Company.  On or about July 9, 2012, LUIS DIAZ, JR., and LUIS JAVIER DIAZ caused a transfer of that same amount, $364,680, to be sent from the Company to an account at JPMorgan Chase in New York held in the name of Sending Company-1.

53. At times, the Company also sent money to the president of Sending Company-1, SC-1 President. For instance, on or about March 22, 2011, the Company received a wire from Sending Company-1 in the amount of $259,610. On or about March 28, 2011, LUIS JAVIER DIAZ, the defendant, received an email from SC-1 President asking for the Company to send that exact amount, $259,610 to SC-1 President at an account at JPMorgan Chase in New York. Wire records show that the Company sent $259,610 to SC-1 President's account on or about March 28, with the record indicating that this was a "credit return" and referencing the same number that appeared on the wire transfer of funds from Sending Company-1 to the Company on March 22.

54. During the relevant period, the Company received at least approximately $9 million from Sending Company-1 in this manner, a substantial portion of which was subsequently distributed to United States bank accounts. In particular, the Company caused at least approximately $5 million to be transferred directly back into Sending Company-1's New York account at JPMorgan Chase.

55. During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, also transferred payments into and within the United States on behalf of Sending Company-2, a group of Venezuelan construction companies with overlapping ownership. For instance, on or about December 5, 2012, Sending Company-2 sent $316,312 to the Company. On or about December 17, 2012, LUIS DIAZ, JR., and LUIS JAVIER DIAZ caused that same amount, $316,312, to be transferred to another account in the United States held in the name of Sending Company-2.

56. During the relevant period, the Company received over $3.4 million from Sending Company-2 in this manner, a substantial portion of which was subsequently distributed to other accounts in the United States, including to accounts held by Sending Company-2.

57. Based on my review of customs records, I am aware that Sending Company-2 did not declare any imports or other shipments to the Company during this time period that would justify the payments described above. Likewise, the Company declared only approximately $2.6 million worth of exports to Sending Company-2, about a million dollars less than the amounts the Company actually received from Sending Company-2.

58. During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, also transferred payments into

18

and within the United States on behalf of Sending Company-3, another Venezuelan company. Oftentimes these inbound and outbound transfers were for the same amount of money. For instance, on or about February 11, 2013, Sending Company-3 sent approximately $77,742.95 to the Company. On or about February 19, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ caused a transfer of that same amount, $77,742.95, to be sent from the Company to an account at US Century Bank in the United States held in the name of Sending Company-3.

59. During the relevant period, the Company received over $100,000 from Sending Company-3 in this manner, a substantial portion of which was subsequently distributed to other accounts in the United States, including to the account held by Sending Company-3.

60. Based on my review of customs records, I am aware that Sending Company-3 did not declare any imports or other shipments to the Company during the relevant time period that would justify the payments described above. Likewise, the Company did not declare any imports or other shipments to Sending Company-3 that would justify the receipt of over $100,000.

61. During the relevant period, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, also used the Company to transmit payments into and through the United States on behalf of a Chilean company, Sending Company-4. On or about September 26, 2016, I spoke with a representative of a Wisconsin-based company that sells bovine products throughout the United States (the "Wisconsin Company"). From speaking with the Wisconsin Company representative, I have learned that the Wisconsin Company obtains its bovine products from Sending Company-4, a Chilean-based distributor in the market.

62. From speaking with the Wisconsin Company representative, I also learned that whenever the Wisconsin Company was due money from Sending Company-4, the Wisconsin Company was paid by wire transfer from third parties. For example, on or about December 16, 2014, LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, caused $35,300.52 to be transferred from the Company to an account held in the name of the Wisconsin Company. Such payments were always at the direction of Sending Company-4. The Wisconsin Company representative further stated that the Wisconsin Company had no business relationship with the Company, and the Company never bought anything of value from the Wisconsin Company. The Wisconsin Company representative was not

sure why Sending Company-4 arranged for the Wisconsin Company to be paid through the Company.

63. As referenced above, as part of my investigation, I have reviewed customs records pertaining to the Company. While the bank records described above show over a hundred and fifty million dollars in transfers from overseas entities to the Company during the relevant period, the customs records show that the Company has only declared approximately $31 million in actual exports during that time period to Venezuelan entities.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of LUIS DIAZ, JR., and LUIS JAVIER DIAZ, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
MATTHEW DE LA ROSA
Lieutenant, Englewood Police Department
Task Force Officer, HSI

Sworn to before me this
December 19, 2016

_____
THE HONORABLE RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

20